**PB AMERICAS INC., f/k/a Parsons Brinckerhoff Quade and Douglas, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY and CNA Insurance Companies, Defendants.**

**No. 09 Civ.1969(LAP).**

United States District Court, S.D. New York.

Feb. 9, 2010.

---

244

Robert Michael Horkovich, Marshall Nathan Gilinsky, Anderson Kill & Olick, P.C., New York, NY, for Plaintiff.

Stephen George Rinehart, Troutman Sanders LLP, New York, NY, Patrick F. Hofer, Troutman Sanders LLP, Washington, DC, for defendants.

### MEMORANDUM & ORDER

LORETTA A. PRESKA, Chief Judge:

Plaintiff PB Americas Inc. ("PB") brings this action for declaratory relief and breach of contract arising out of Defendants Continental Casualty Company's ("Continental") and CNA Insurance Companies' ("CNA") alleged refusal to provide coverage pursuant to a professional liability insurance policy. PB also brings a claim under New York's General Business Law ("GBL") § 349 alleging that Defendants engaged in deceptive acts and practices by denying PB's insurance claims. Defendants now move to dismiss the Complaint ("Complaint" or "Am. Compl.") pursuant to Fed.R.Civ.P. 12(b)(6) on that grounds that: (1) PB has failed to allege sufficient facts that CNA is a joint venture and therefore liable for the breach of contract claim; (2) PB failed to satisfy a condition precedent thereby vitiating Defendants' obligations under the contract; and (3) PB's § 349 claim fails because the alleged deceptive conduct was not consumer oriented. Plaintiff cross-moves to strike the declaration and accompanying attachments from Defendants' moving papers. For the reasons set forth below, Defendant CNA's motion to dismiss is granted, Defendant Continental's motion to dismiss is granted in part and denied in part, and Plaintiff PB's cross-motion to strike is granted in part and denied in part.

## I. BACKGROUND [1]

### A. Plaintiff's Insurance Coverage

PB and Bechtel Infrastructure Corp. ("Bechtel") were the two principals in an unincorporated joint venture ("B/PB"). (Am. Compl. ¶ 11.) B/PB managed the design and construction of the Central Artery/Tunnel Project ("CA/T Project," more commonly referred to as the "Big Dig") pursuant to several contracts with the Massachusetts Turnpike Authority ("MTA") and the Massachusetts Highway Department ("MHD"). (Id. ¶¶ 10, 12.) Defendants sold PB a Professional Liability and Pollution Incident Liability Insurance Policy (the "Policy") for the claims-made policy period between November 1, 2002 through November 1, 2003. (Id. ¶ 8; Declaration of Wallace A. Christensen ("Christensen Decl."), Ex. A ("Continental Policy").)

The Policy provided excess liability coverage over and above the coverage provided to PB pursuant to the Owner Controlled Insurance Program ("OCIP"). (Am. Compl. ¶ 25; Christensen Decl., Ex. B. (the "OCIP Policy").) The OCIP was specific to the CA/T Project and consisted of five insurance policies issued by different insurers. The OCIP provided $50 million in insurance coverage. (Am. Compl. ¶ 25.) The Policy provided $25 million coverage per claim and $25 million in the aggregate, subject to a $1 million self-insured retention per claim and a $4 million aggregate self-insured retention. (See Continental Policy at 1, 1A, 1B.) As set forth in the Policy, coverage would be provided in excess to any project specific insurance available to PB:

> If there is other collectible insurance, including but not limited to project spe-

cific insurance, that applies to a claim covered by this Policy, the other insurance must pay first and this Policy is excess over the other insurance. This Policy applies to the amount of the claim that exceeds the available limit of liability and any deductible or retention amounts of the other insurance.

(Id. § VI.K.) If the OCIP's coverage was extinguished, the Policy would cover

> all amounts in excess of the self-insured retention and deductible up to the limit of liability that [PB becomes] legally obligated to pay as a result of:
>
> 1. a wrongful act; or
>
> 2. a pollution incident arising out of [PB's] activities or the activities of any person or entity for whom you are liable,
>
> that results in a claim anywhere in the world, provided that on the knowledge date set forth on the Declarations no General Counsel or Insurance Manager of Parsons Brinckerhoff Inc. knew or could reasonably have been expected to know that a claim would be made.

(Id., Endorsement 16.) In the instant case, the most pertinent portion of the Policy concerned PB's duties in the event a claim was made against PB. Specifically, the Policy set forth that

> If there is a claim, your general counsel or insurance manager must do the following: ... refuse, except solely at your own cost, to voluntarily, without our approval, make any payment, admit liability, assume any obligation or incur any expense.

(Id., Endorsement 16; § VI.B.5.)

In October 2003, the parties began to renegotiate the renewal of the Policy.

---

1. The below background facts do not include the factual allegations concerning whether CNA is a joint venture. Those factual allega-tions will be addressed in more detail in Part II.B, infra.

(Am. Compl. ¶ 15.) Defendants sold PB an extending reporting period ("ERP") that would cover CA/T Project claims reported on or before December 31, 2008. (*Id.* ¶ 16.) Although the ERP did not provide for additional coverage limits, PB paid an additional premium of $2,720,309 for the coverage. (*Id.*)

## B. *CA/T Project Issues*

Beginning in 1994, B/PB was presented with notices of potential claims by the MTA regarding cost overruns by B/PB in connection with its work on the CA/T Project. (*Id.* ¶ 13.) PB maintains that it regularly provided Defendants with notice of these potential claims. (*Id.*) In or around December 2003, PB became aware that the Commonwealth of Massachusetts ("Commonwealth") was considering filing a civil complaint seeking $150,000,000 in damages against PB, B/PB, and Bechtel relating to alleged mismanagement of the CA/T Project. (*Id.* 17.) As it did before, PB notified Defendants of the development by letter dated December 18, 2003, and sought Defendants' assistance in coordinating PB's defense to any such suit. (*Id.*) By letter dated January 17, 2004, Defendants responded to PB's notice and requested that PB provide them with information regarding other policies and stated that Defendants' coverage was only applicable upon the exhaustion of all other insurance available to PB. (*Id.* ¶ 18.)

On March 16, 2004, the Commonwealth filed a civil lawsuit against PB, B/PB, and Bechtel alleging several causes of action—all of which were covered under the Policy. (*Id.* ¶ 19.) PB notified Defendants of the suit and also informed Defendants of the possibility of a global settlement. (*Id.* ¶ 20.) By letter dated March 3, 2005, Defendants declined coverage on several bases including:

Indeed, an excess insurer is not required to contribute to the defense of the insured so long as the primary insurer is required to defend. Consequently, CNA has no obligation to defend Parsons ... until at the soonest the primary coverage provided by the OCIP is exhausted.

(*Id.* ¶ 21.) Despite this letter, PB continued settlement negotiations, provided Defendants with status updates, and eventually reached a global settlement in the amount of $85,000,000. (*Id.* ¶ 23.) Defendants, however, failed to contribute to any settlement above the OCIP $50 million coverage limit on the grounds that any settlement above the OCIP limit would be due to "political" value to PB and not due to any actual legal exposure. (*Id.* ¶ 25.) The parties convened on July 7, 2006 to discuss Defendants' coverage, but Defendants continued to refuse coverage. (*Id.* ¶ 28.)

## C. *Ceiling Panel Incident*

On July 10, 2006, concrete ceiling panels and associated components collapsed onto the eastbound lanes of the I–90 Connector Tunnel resulting in the death of a passenger in a vehicle. (*Id.* ¶ 29.) PB provided Defendants with notice of a wrongful death claim on August 15, 2006. (*Id.* ¶ 31.) On November 26, 2006, the Commonwealth and the MTA/MHD filed another civil lawsuit against PB, B/PB, and Bechtel alleging various causes of action, all of which were covered by the Policy. (*Id.* ¶ 32.) On December 20, 2006, the City of Boston intervened in the action, and shortly thereafter, various other state and federal agencies were inquiring into the incident. (*Id.* ¶¶ 34–35.)

Over the course of the next year, PB, B/BP, and Bechtel engaged in settlement discussions with all of the various claimants. At all times, PB continued to keep Defendants apprised of the negotiations; however, PB claims that Defendants "nev-

er changed [their] coverage position, never agreed to defend PB, and never stated it was willing to consent to the settlements being discussed by PB." (*Id.* ¶ 43.) In January 2008, PB, B/PB, and Bechtel reached a settlement with the government authorities for all claims and potential claims. The parties settled for $400 million, of which PB's share was just over $47 million. (*Id.* ¶ 45.) According to PB, Defendants refused to provide PB with coverage for PB's share of the settlement. (*Id.* ¶ 47.)

## II. *ANALYSIS*

### A. *Fed.R.Civ.P. 12(b)(6) Standard*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* — U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557, 127 S.Ct. 1955.

In *Iqbal,* the United States Supreme Court set forth a "two-pronged" approach for analyzing a motion to dismiss. *Iqbal,* 129 S.Ct. at 1950. First, after accepting plaintiff's factual allegations as true and drawing all reasonable inferences from those allegations in plaintiff's favor, the court may identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. Second, once the court has stripped away the conclusory allegations, it must determine whether the

complaint's "well-pleaded factual allegations ... plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Evaluating the plausibility of a plaintiff's claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citation omitted).

Issues of contract interpretation are "generally matters of law and therefore [are] suitable for disposition on a motion to dismiss." *Citadel Equity Fund, Ltd. v. Aquila, Inc.,* 371 F.Supp.2d 510, 516 (S.D.N.Y.2005) (quoting *Thayer v. Dial Indus. Sales, Inc.,* 85 F.Supp.2d 263, 269 (S.D.N.Y.2000)) (internal quotation marks omitted); *see Lind v. Vanguard Offset Printers, Inc.,* 857 F.Supp. 1060, 1065 (S.D.N.Y.1994).

### B. *CNA's Motion to Dismiss*

As detailed above, in *Iqbal* the Supreme Court instructed lower courts to strip away those allegations that do nothing more than recite the elements of a cause of action. *See Iqbal,* 129 S.Ct. at 1949. Here, the Complaint merely recites the elements of a joint venture and includes other factual allegations that do not save the pleading.

The chart below provides a side by side comparison of the five elements required by New York law to establish a joint venture and five paragraphs from PB's Com-

plaint.[2]

| Elements | Allegations |
| --- | --- |
| (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; | Upon information and belief, the principals of CNA insurance companies, including Continental, have an agreement whereby they operate together as an enterprise for profit. (Am. Compl. ¶ 55.) |
| (2) their agreement must evidence their intent to be joint venturers; | Upon information and belief, the principals of CNA, including Continental, entered into such enterprise with the mutual intent to be joint venturers. (Am. Compl. ¶ 58.) |
| (3) each must make a contribution of property, financing, skill, knowledge, or effort; | Upon information and belief, the principals of CNA, including Continental, each contribute property, financing, skill, knowledge or other effort to the joint venture. (Am. Compl. ¶ 60.) |
| (4) each must have some degree of joint control over the venture; and | Upon information and belief, the principals of CNA, including Continental, exercise a degree of joint management control over the joint venture. (Am. Compl. ¶ 62.) |
| (5) there must be a provision for the sharing of both profits and losses. | Upon information and belief, the principals of CNA, including Continental, have a provision for the sharing of losses and profits. (Am. Compl. ¶ 64. |

Both *Iqbal* and *Twombly* require that these allegations be disregarded in the Court's determination of whether a joint venture plausibly exists. In doing so, this Court is left with factual allegations that are "not only compatible with, but indeed [ ] more likely explained by," a parent-subsidiary relationship between CNA and Continental, not a joint venture. *Twombly*, 550 U.S. at 567, 127 S.Ct. 1955.

■ Once the legal conclusions are stripped away, this Court is left with facts including: (1) CNA shares employees who conduct the business of all member insurance companies (Am. Compl. ¶ 53); (2) CNA has a Chairman of the Board and CEO as well as a Senior Vice President, General Counsel, and Secretary (*id.* ¶ 54); and (3) Defendant Continental's Annual Statement for the year ending December 31, 2007 refers to the financial conditions

of the "Combined Companies" (*id.* ¶ 56). These allegations show that CNA is an entity that is capable of being sued and has some relationship with Continental, but the Court cannot infer from the allegations that CNA is a joint venture liable for Continental's alleged breach of contract. Accordingly, PB's claims against CNA are dismissed. Plaintiff's request for discovery in order to frame a complaint is denied.

### C. Declaratory Judgment and Breach of Contract Claims

■ To prevail on a claim for breach of contract, a plaintiff must establish: (1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach. *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F.Supp.2d 155, 160 (S.D.N.Y.2007). PB

---

**2.** The elements of a joint venture are taken from *Itel Containers Int'l Corp. v. Atlanttrafik*

*Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir.1990).

argues that Defendants breached their obligations under the Policy by "refusing or failing to honor the terms of the Policy and denying or failing to provide coverage to PB for its liability incurred under the terms of the Settlement." (Am. Compl. ¶ 81.) PB further maintains that Defendants' alleged defenses, which, Defendants argue preclude coverage, are improper and that Defendants' refusal to provide coverage has caused PB monetary damage. (*Id.* ¶ 85.)

Under New York law, courts will not look beyond the four corners of a contract unless the contractual terms are ambiguous. The existence of ambiguity is a threshold question to be decided by the court as a matter of law. *See Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir.2000) (applying New York law). Ambiguity is determined from the face of the agreement. *Reiss v. Fin. Performance Corp.,* 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001). Courts will not examine extrinsic evidence "to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *Id.*

Here, PB contends that it fully complied with its obligations under the contract. Specifically, PB. alleges that it: (1) procured the Policy; (2) paid all of the premiums due under the Policy; (3) complied with all conditions in connection with the Policy; (4) timely provided Defendants with notice of potential claims; and (5) kept Defendants apprised of updates regarding negotiations. (*See, e.g.,* Am. Compl. ¶¶ 8, 9, 13–14, 17, 20, 22.) PB alleges that Defendants breached the Policy by taking the position that the Policy provided only excess insurance for which the coverage would be triggered once the limit of primary coverage (*i.e.,* the OCIP) was exhausted. (*See id.* ¶ 21.) PB also alleges that Defendants "never changed [their] coverage position, never agreed to defend PB, and never stated [they were] willing to consent to the settlements being discussed by PB." (*Id.* ¶ 43.)

The Policy states that PB must "refuse, except solely at [PB's] own cost, to voluntarily, without our approval, make any payment, admit liability, assume any obligation or incur any expense." (Continental Policy, Endorsement 16; § VI.B.5.) Continental argues that PB failed to seek Continental's approval before entering into both settlements, thereby violating an express condition precedent and vitiating Continental's obligation to provide coverage.

Under New York law, "unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court." *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.,* 10 N.Y.3d 170, 177, 855 N.Y.S.2d 45, 884 N.E.2d 1044 (2008) (citation and internal quotation marks omitted). If a party to a contract fails to perform a condition precedent, its counterparty is relieved of its obligation to perform under the contract. *See, e.g., Trident Int'l Ltd. v. Am. Steamship Owners & Indem. Ass'n, Inc.,* No. 05 Civ. 3947, 2008 WL 2909389, at *4 (S.D.N.Y. July 24, 2008) ("It is undisputed that where an insured fails to comply with a condition precedent to insurance coverage, the insurance contract is vitiated."); *E. Baby Stores, Inc. v. Cent. Mut. Ins. Co.,* No. 07 Civ. 3890, 2008 WL 2276527 (S.D.N.Y. June 2, 2008) (finding that plaintiff's failure to give insurer timely notice of claim constituted " 'a failure to comply with a condition precedent which, as a matter of law, vitiates the contract.' ") (quoting *Great Canal Realty Corp. v. Seneca Ins. Co., Inc.,* 5 N.Y.3d 742, 743, 800 N.Y.S.2d 521, 833 N.E.2d 1196 (2005)). New York law views an insurer's right to

consent to any settlement as a condition precedent to coverage. *See Vigilant,* 10 N.Y.3d at 178–79, 855 N.Y.S.2d 45, 884 N.E.2d 1044 (finding plaintiff's failure to obtain defendant insurer's approval to settlement violated the terms of the insurance policy and precluded coverage); *see Cont'l Cas. Co. v. Ace Am. Ins. Co.,* No. 07 Civ. 958, 2009 WL 857594, at *3 (S.D.N.Y. Mar. 31, 2009) ("Under New York law, consent-to-settle provisions are a condition precedent to coverage and are routinely enforced."); *See TLC Beatrice Int'l Holdings v. CIGNA Ins. Co.,* No. 97 Civ. 8589, 2000 WL 282967, at *4 (S.D.N.Y. Mar. 16, 2000), *aff'd* 234 F.3d 1262 (2d Cir.2000) (insurer entitled to judgment where insured did not comply with "seemingly straightforward provision" that required insurer's prior written consent to any settlement). However, as a general rule, "the nonoccurrence of a condition, even an express condition precedent, may be waived by words or from an inference from a party's conduct." *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.,* No. 07 Civ. 432, 2008 WL 650403, at *8 (S.D.N.Y. Mar. 7, 2008) (citing Glen Banks, 28 N.Y. Prac., Contract Law § 11:7 (2007) (collecting cases)).

■ Here, Continental argues that PB's failure to obtain Continental's consent before entering into the $85 million settlement is a "fatal breach" of the contract and relieves Continental from providing coverage under the Policy. (*See* Continental Br. at 9.) PB counters that Continental's refusal to provide coverage for the original $85 million settlement, and its subsequent refusals to defend, excused PB from complying with the consent condition. (*See* Pl. Opp. Br. at 8.) PB relies on the well-settled New York rule that "where an insurer 'unjustifiably refuses to defend a suit, the insured may make a reasonable settlement or compromise of the injured party's claim, and is then enti-

tled to reimbursement from the insurer, even though the policy purports to avoid liability for settlements made without the insurer's consent.'" *Isadore Rosen & Sons, Inc. v. Sec. Mut. Ins. Co. of N.Y.,* 31 N.Y.2d 342, 347, 339 N.Y.S.2d 97, 291 N.E.2d 380 (1972) (quoting *Cardinal v. State of N.Y.,* 304 N.Y. 400, 410, 107 N.E.2d 569 (1952)). In *Rosen,* the Court of Appeals reversed a grant of summary judgment and found a triable issue of fact as to whether consent was unreasonably withheld. *Id.* at 348, 339 N.Y.S.2d 97, 291 N.E.2d 380. The Court reasoned that "[t]he provision against settlement by insured cannot be taken advantage of by insurer, where it unreasonably delays to take any action, after notice of the claim." *Id.* (citations and internal quotation marks omitted). A fine line exists, however, between a denial of coverage and a disclaimer of coverage.

In *Seward Park Hous. Corp. v. Greater N.Y. Mut. Ins. Co.,* the Appellate Division observed that courts had been using the terms "repudiation" and "disclaimer" interchangeably. 43 A.D.3d 23, 30–31, 836 N.Y.S.2d 99 (N.Y.App.Div., 1st Dep't, 2007). The court noted that where an insurer "shape[s] its conduct in accordance with the provisions of the contract" and "explain[s] the denial of coverage with reference to policy provisions and exclusions," this is a "disclaimer" of coverage, not a "repudiation" of the contract of insurance. *Id.* at 32, 836 N.Y.S.2d 99. "If an insurer repudiates the policy, the insured is relieved of its policy obligations; conversely, if the insurer merely disclaims an individual claim, the insured continues to be obligated to comply with its contractual responsibilities." *Bear Wagner Specialists, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* No. 650261/08, 24 Misc.3d 1218(A), 2009 WL 2045601, at *7 (N.Y.Sup. Ct., July 7, 2009); *see Nat'l R.R. Passenger Corp. v. Steadfast Ins. Co.,* No. 06 Civ.

6072, 2009 WL 562610, at *13 (S.D.N.Y. Mar. 5, 2009) (applying New York law and stating that the defendant insurer's letter denying coverage was "better characterized as a disclaimer of coverage rather than a repudiation" where the denial was not "'unequivocal' or 'absolute' but was based on the particular set of factual circumstances contained ·in the [complaint submitted for coverage]"); *Estee Lauder, Inc. v. OneBeacon Ins. Group, LLC*, 62 A.D.3d 33, 35, 873 N.Y.S.2d 592 (N.Y.App. Div., 1st Dep't, 2009) ("An insurer's notice of disclaimer must promptly apprise the claimant with a high degree of specificity of the ground or grounds on which the disclaimer is predicated. Of course, an insurer may reserve the right to disclaim on such different or alternative grounds as it may later find to be applicable."). Here, it appears from the allegations that Continental's March 3, 2005 letter was a disclaimer, not a denial. (*See* Am. Compl. ¶ 21.) In the letter, Continental reiterated that the Policy provided excess insurance and that coverage was triggered only when the "primary coverage provided by the OCIP is exhausted." (*Id.*) What is not known, however, is what type of refusals of coverage Continental gave to PB subsequent to the March 3 letter. PB maintains that after the ceiling panel collapsed, it faced liability potentially exceeding $1 billion and that Continental refused to provide coverage.

 Based on PB's allegations, which must be taken as true, it is unclear at this stage whether Continental's repeated refusals to provide. coverage were unreasonable. The Complaint is replete with allegations that despite PB's attempts to engage Continental in the settlement negotiations, Continental "never agreed to defend PB." (*See, e.g.,* Am. Compl. ¶ 43.) Drawing all reasonable inferences in favor of PB, even though the allegations are thin, it would be premature at this stage

to dismiss PB's claim. Accordingly, Continental's motion to dismiss counts I and II is denied. *See Trident Int'l Ltd. v. Am. Steamship Owners & Indem. Ass'n, Inc.,* No. 05 Civ. 3947, 2008 WL 2909389, at *4 (S.D.N.Y. July 24, 2008) ("[W]here, as here, the existence of compliance *vel non* [of a condition precedent] depends on the resolution of factual issues, summary judgment is inappropriate."); *Sphere Drake Ins. Co. v. Y.L. Realty Co.,* 990 F.Supp. 240, 242 (S.D.N.Y.1997) (a determination as to the timeliness of compliance with a condition precedent to insurance coverage is generally an issue of fact); *Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.,* 42 A.D.3d 559, 840 N.Y.S.2d 144, 145 (N.Y.App.Div., 2d Dep't, 2007) (denying summary judgment when the insurer did not demonstrate as a matter of law that the insured failed to comply with conditions precedent to coverage).

### D. *NY GBL § 349 Claim*

 New York law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW § 349 (McKinney's 2001). To state a cause of action under § 349, a plaintiff must assert "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 277 F.Supp.2d 269, 273 (S.D.N.Y.2003); *see Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.,* 300 A.D.2d 608, 752 N.Y.S.2d 400, 401 (2d Dep't 2002). The focus of § 349 cases is whether the alleged deceptive practice was "consumer oriented." *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (N.Y. 1995). In *Oswego,* the New York Court of Appeals expanded on the consumer orient-

ed focus by stating that "[p]rivate contract disputes unique to the parties . . . .would not fall within the ambit of the statute." *Id.* at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741.

██ A defendant will not be held liable under § 349 where "the disputed private transaction does not have 'ramifications for the public at large.'" *Exxonmobil Inter-America, Inc. v. Advanced Info. Eng'g Servs.*, 328 F.Supp.2d 443, 449 (S.D.N.Y. 2004) (quoting *Canario v. Gunn*, 300 A.D.2d 332, 751 N.Y.S.2d 310, 310 (2d Dep't 2002)). As the district court in *Exxonmobil* discussed, the meaning of the above proposition is two fold: "First, § 349 liability attaches primarily where a party's misrepresentations are boilerplate and have the potential to be repeated in order to deceive numerous similarly situated buyers . . . . Second, allegedly deceptive acts that occur between relatively sophisticated entities with equal bargaining power do not give rise to § 349 liability." 328 F.Supp.2d at 449. As the New York Court of Appeals discussed in *N.Y. Univ. v. Cont'l Ins. Co.*, a case involving a complex insurance transaction,

> this was not the "modest" type of transaction [§ 349] was primarily intended to reach. It is essentially a "private" contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large. Accordingly the [§ 349] cause of action should be stricken.

87 N.Y.2d 308, 321, 639 N.Y.S.2d 283, 662 N.E.2d 763 (N.Y.1995) (internal citations omitted). Specifically, the Court in *N.Y. Univ.* found that contracts that are not "standard policy" but are instead designed to provide services "tailored to meet the [plaintiff's] wishes and requirements" are not consumer oriented for § 349 purposes. *Id.* at 321, 639 N.Y.S.2d 283, 662 N.E.2d 763.

██ Here, despite PB's allegations that Defendants' conduct was "deceptive and misleading to the public at large," Defendants are not liable under § 349 because the alleged conduct was not "consumer oriented." (Am. Compl. ¶ 97.) First, as was the case in *N.Y. Univ.*, the transaction at issue in this case concerns complex professional liability coverage. *See, e.g., N.Y. Univ.*, 87 N.Y.2d at 320–21, 639 N.Y.S.2d 283, 662 N.E.2d 763. The insurance policy here was not a "standard form used by other consumers" as PB argues in its opposition (Pl. Opp. Br. at 16) but was instead a carefully negotiated contract that contained some thirty-seven separate endorsements. (*See* Christensen Decl., Ex. A.) Second, PB is not the "little guy" consumer that § 349 is intended to protect. *See Exxonmobil*, 328 F.Supp.2d at 450 (quoting *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 73, 709 N.Y.S.2d 74 (1st Dep't 2000) ("[S]ection 349[ ] is intended to protect consumers, that is, those who purchase goods and services for personal, family or household use.")). PB managed a massive construction project and sought $25 million in excess liability insurance from Defendants. (Am. Compl. ¶¶ 8, 12.) PB is hardly the individual consumer susceptible to deceptive marketing practices. *See Exxonmobil*, 328 F.Supp.2d at 448–49 (listing cases where New York courts found that "business-to-business transactions do not give rise to § 349 claims").

Finally, several courts in this Circuit have considered whether disputes between policy holders and insurance companies concerning the scope of coverage can amount to conduct falling within § 349. Almost uniformly, those courts have held that such disputes are nothing more than private contractual disputes that lack the consumer impact necessary to state a claim pursuant to § 349. *See, e.g., Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir.2000) (dispute concerning scope of coverage under disability policy);

*DePasquale v. Allstate Ins. Co.*, 179 F.Supp.2d 51, 62 (E.D.N.Y.2002) (dispute concerning coverage under homeowner's insurance); *Moxy Ultimate, Inc. v. Great Northern Ins. Co.*, No. 00 Civ. 4076, 2001 WL 194896, at *3 (S.D.N.Y. Feb. 27, 2001) (dispute concerning coverage under fire insurance policy); *Allahabi v. N.Y. Life Ins. Co.*, No. 98 Civ. 4334, 1999 WL 126442, at *2 (S.D.N.Y. Mar. 10, 1999) (dispute involving coverage under a life insurance policy); *MaGee v. Paul Revere Life Ins. Co.*, 954 F.Supp. 582, 586–87 (E.D.N.Y.1997) (dispute concerning coverage under disability policy). Accordingly, PB's claim pursuant to N.Y. Gen. Bus. L. § 349 is dismissed.

### III. *PB's CROSS–MOTION TO STRIKE*

PB cross-moves to strike the affidavit of Wallace A. Christensen and its accompanying exhibits. Exhibits A and B are copies of the Policy and the OCIP Policy, respectively. Exhibit C is a copy of the January 4, 2004 letter referenced in paragraph 18 of the Complaint, and Exhibit D is a copy of the March 3, 2005 letter referenced in paragraph 21 of the Complaint.

 It is generally true that when material outside a complaint is attached to a defendant's motion to dismiss and considered by the court, the motion is converted from motion to dismiss to one for summary judgment. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, if a document is not attached to the Complaint but is incorporated by reference a court may consider it on a motion to dismiss. *See id.* Even where a complaint does not incorporate a document by reference, but instead "relies heavily upon [a document's] terms and effect," a court may deem the document "integral" to the complaint and consider it

on a motion to dismiss without converting the motion to one for summary judgment. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam); *see also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991) ("[W]hen plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.") (citations omitted). "A plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers*, 282 F.3d at 153 (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991)).

Here, PB alleges that Defendants breached the Policy by refusing to provide coverage to the claims arising out of the CA/T Project. By the very nature of the suit, the Policy at issue is an integral document to the Complaint.[3] Moreover, because the Policy provides excess insurance, PB's other insurance—namely, the OCIP Policy—is also integral to the Complaint. *See Chambers*, 282 F.3d at 153 (finding that district court did not err by considering contracts that were "integral to the Amended Complaint" on a motion to dismiss). The same is not true, however, for the letters. Defendants attach two, unsigned letters to Christensen's declaration. As the Court of Appeals noted in *Chambers*, "[c]ourts have declined to consider unsigned documents in ruling on motions to dismiss." *Id.* at 154 n. 5. Additionally, the letters do not form an integral part of PB's Complaint. Accordingly, Exhibits A and B will be considered on this motion because they are both integral to

---

**3.** As an aside, while PB moves to strike the Policy on the one hand, it sees nothing wrong with citing portions of the Policy, which were not cited in the Complaint, in its opposition brief. (*See* Pl. Opp. at 13.) Clearly, the terms of the Policy are vital to PB's claims.

254

the Complaint and incorporated by reference, but Exhibits C and D will not be considered as they are unsigned and do not form an integral part of PB's Complaint.

## CONCLUSION

For the reasons set forth above, Defendant Continental Casualty Company's motion to dismiss [dkt. no. 9] is GRANTED in part and DENIED in part, Defendant CNA Insurance Companies' motion to dismiss [dkt. no. 12] is GRANTED, and Plaintiff PB Americas Inc.'s motion to strike [dkt. no. 21] is GRANTED in part and DENIED in part.

The parties shall confer and inform the Court by letter no later than February 24, 2010, as to how they propose to proceed. SO ORDERED.